# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Apple, Inc., One Apple Park Way
Cupertino, CA 95014 (One Subject Account)

Case No. 26mj6654

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the Northern District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. §§ 1346, 2242, 2244, 1801, and 875 | Honest Services Fraud; Sexual Abuse by Threat, Fear, or Coercion; Abusive Sexual Contact; Video Voyeurism; and Extortion by Interstate Commerce |

The application is based on these facts:

See Attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Brittany Radke, FBI Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 11/06/2026

*Judge's signature*

City and state: San Diego, CA

Hon. Brian J. White, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT

I, Special Agent Brittany Radke, being duly sworn, state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to obtain and search records from Apple, Inc. ("Apple") in support of an investigation into extortion and sexual coercion by a government official. Apple is an electronic communications service provider and/or remote computing service provider. Apple is headquartered at One Apple Park Way, Cupertino, California 95014. The items to be searched are described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Apple to disclose copies of the information (including the content of communications) further described in Attachment B. Attachments A and B are incorporated into this affidavit by reference.

2. As detailed below, there is probable cause to believe that Eddie A. Cedeño ("CEDEÑO"), the former Deputy Director of Public Works for the County of Imperial, committed violations of federal law, such as 18 U.S.C. §§ 1346 (Honest Services Fraud), 2242 (Sexual Abuse by Threat, Fear, or Coercion), 2244 (Abusive Sexual Contact), 1801 (Video Voyeurism), and 875 (Extortion by Interstate Communication) (collectively, the "**Subject Offenses**"), and evidence of the **Subject Offenses**, as set forth in Attachment B, will be found the following Apple iCloud account (the "**Subject Account**"):

| **Provider** | **Account** | **Subscriber** |
|---|---|---|
| Apple, Inc.<br>One Apple Park Way<br>Cupertino, California<br>95014 | Apple ID: eduardoc393@gmail.com<br>DS ID: 1038070157 | Eddie CEDEÑO |

3. The information contained in this affidavit is based upon my training, experience, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from my participation and

observations in the investigation, as well as reviewing reports prepared by other law enforcement agents and other evidence related to this case. This affidavit is made for the limited purpose of obtaining a search warrant for the **Subject Account**. The affidavit does not contain all the information known by me or other law enforcement agents about this investigation. Rather, it contains only the facts believed to be necessary to establish the requisite probable cause. All statements are summarized and not verbatim unless otherwise indicated. All dates, times, and figures are approximate.

## TRAINING AND EXPERIENCE

4. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2019. I am currently assigned to the FBI San Diego Field Office, Imperial County Resident Agency. I am experienced in the investigation of various federal offenses, including drug smuggling, interstate car theft, sexual abuse, and public corruption matters. Before my current assignment, I was assigned to the FBI Los Angeles Field Office. Since July 2019, I have worked with the Crimes Against Children and Human Trafficking unit. In my prior assignment, I also worked with the Long Beach Violent Crimes & Major Offenders squad.

5. During my employment as an FBI Special Agent, I have gained experience in investigating offenses committed by public officials by conducting and participating in investigations and receiving on-the-job training with more experienced and senior agents. As part of these investigations, I have used and discussed with other law enforcement agents various investigative techniques, including the use of confidential human sources, undercover operations, § 2703(d) orders, and search warrants.

6. I received training at the FBI Academy in Quantico, Virginia. This training covered a variety of investigative techniques and legal matters, including the preparation and execution of search warrants. I also received training in investigating violent and sexual crimes, including offenses by extortion or coercion. My current duties include preparing, presenting, and serving arrest and search warrants, in addition to investigating crimes committed by public officials, within the Southern District of California.

## THE SUBJECT ACCOUNT

7. The **Subject Account** is an Apple iCloud account stored at a premises owned, maintained, controlled, or operated by Apple.

8. Based on subpoena returns from Apple:

a. the **Subject Account** was created on or about September 30, 2012, and the "Account Status" for the **Subject Account** is "Active"[1];

b. the owner or user of the **Subject Account** is "Eddie Cedeño"; and

c. the Apple ID for the **Subject Account** is eduardoc393@gmail.com.

9. Further, based on subpoena returns from Apple, the **Subject Account** is a "Full iCloud (iCloud+)" account and it has the following iCloud features: iCloud Backup (iOS Devices), Bookmarks, Calendars, iCloud Photos, Contacts, Find My Friends, iCloud Drive, iCloud Invites, iCloud Reminders, Mail, Mail Header, Maps, Messages in iCloud, Notes, Safari Browsing History, Sign in with Apple, and Voice Memo. According to the subpoena returns, the **Subject Account** has used the iCloud Drive feature.

## APPLICABLE STATUTES

10. Based upon my training, experience, and consultation with other federal, state, and local law enforcement agents, and my knowledge of and experience with federal laws and regulations, I understand the following to be true:

a. Title 18, United States Code, Section 1346 (Honest Services Fraud), makes it a crime to devise or knowingly participate in a material scheme or plan to deprive the public or a government entity to its intangible right of honest services through bribes or kickbacks.

b. Title 18, United States Code, Section 2242 (Sexual Abuse by Threat, Fear, or Coercion), makes it a crime to knowingly cause another person to engage in sexual activity by threatening or placing that person in fear or to knowingly engage in a sexual act with another person without that person's consent, to include doing so through coercion.

[1] Apple produced the subpoena returns for the **Subject Account** in November 2026, and the **Subject Account** was designated as "Active" on the date of production.

c. Title 18, United States Code, Section 2244 (Abusive Sexual Contact), makes it a crime to have sexual contact with another person without that person's permission. Sexual contact means the "intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(3).

d. Title 18, United States Code, Section 1801 (Video Voyeurism), makes it a crime to intentionally capture an image of a private area of an individual without their consent, and to knowingly do so under circumstances in which the individual has a reasonable expectation of privacy.

e. Title 18, United States Code, Section 875 (Extortion by Interstate Communication), makes it a crime to, with the intent to extort any money or other thing of value from an individual, transmit in interstate commerce any communication containing any threat to injure the property or reputation of another person.

## FACTS IN SUPPORT OF PROBABLE CAUSE

### A. The County of Imperial Investigated CEDEÑO for Sexual Misconduct

11. I reviewed FBI reports regarding the investigation into CEDEÑO and learned the following:

12. In or around August 2025, FBI Special Agents learned that CEDEÑO had resigned from his official position at the County of Imperial in 2024 due to an investigation conducted at the direction of Imperial County Human Resources ("ICHR"). It was reported that ICHR hired a private investigator, Paladin Investigations and Training Solutions, Inc. ("Paladin"), to investigate allegations that CEDEÑO used his official position to coerce sexual favors from other men at his place of employment, including his subordinates. CEDEÑO allegedly had engaged in sexual behavior and contact at work, and covertly recorded the sexual encounters and saved them to his cell phone and Apple iCloud account. The FBI also learned that the matter was referred to the Imperial County District Attorney's Office.

13. On or about August 22, 2025, FBI Special Agent Mitchel Burkholder spoke with an investigator with the Imperial County District Attorney's Office. The investigator confirmed that CEDEÑO's work phone contained several videos depicting CEDEÑO engaging in sexual activity with other adult males, some of which appeared to be recorded in a workplace setting. The investigator also confirmed that the videos appeared to be recorded from a device(s) held by CEDEÑO at the time of recording and did not appear to be hidden camera recordings.

14. On or about October 3, 2025, the same investigator with the Imperial County District Attorney's Office informed FBI Special Agent Burkholder that one of the videos he observed on CEDEÑO'S work phone showed CEDEÑO performing oral sex on another unidentified male. The video appeared to be recorded from a digital device that was facing both CEDEÑO and the other adult male. The video showed the other adult male looking at a cell phone while CEDEÑO performed oral sex on him. The investigator could not tell by watching the video if it was covertly recorded or not.

**B. The Paladin Investigation Report**

15. In or around April 2026, the County of Imperial produced documents, videos, and other records regarding CEDEÑO and the Paladin investigation into his alleged sexual misconduct in response to a subpoena. I reviewed these materials, including a 35-page Paladin Investigation Report dated May 20, 2024, with supporting documents.

**(1) Text messages**

16. As detailed in the Paladin investigation report, a Paladin investigator was provided multiple pages of Facebook messenger and WhatsApp communications between CEDEÑO and a male employee at the County of Imperial ("Individual-1") regarding an alleged sexual misconduct matter. The messages were sent between March and April of 2019. While many of the messages appeared to have been sent with some type of humor in mind,[2] they show that CEDEÑO asked Individual-1 to send him photos of Individual-1's

[2] According to Individual-1, he responded to CEDEÑO's messages with humor because he did not how to respond to them and he did not want to upset CEDEÑO.

penis and pornographic videos of Individual-1 in exchange for monetary compensation. The messages also show that CEDEÑO's requests began in a subtle way and progressed into more serious requests.

17. Individual-1 began his employment with the County of Imperial in 2018 as a maintenance technician. Individual-1 worked under CEDEÑO at the time of the referenced text messages. Individual-1 was married to an adult woman at the time.

***i. Facebook Messenger***

18. Between March 8 and 11, 2019, CEDEÑO and Individual-1 used Facebook Messenger to exchange pornographic videos and discuss sexual matters, including the size of Individual-1's penis. Individual-1 was married to an adult female at the time.

19. Namely, on or about March 11, 2019, CEDEÑO sent a pornographic video to Individual-1 and asked Individual-1 to send a video of himself. CEDEÑO followed up and told Individual-1 not to get upset about it. Later, CEDEÑO again told Individual-1 not to get upset and claimed he was kidding about the request. Individual-1 responded that he could not reply at an earlier time because he was driving a motorcycle.

20. Later, on or about March 11, 2019, the size of Individual-1's penis came up between CEDEÑO and Individual-1. Specifically, in response to a pornographic video, CEDEÑO told Individual-1 that Individual-1 could charge money if his penis was that big. Individual-1 responded by telling CEDEÑO that Individual-1 should become a pornstar. CEDEÑO replied by asking Individual-1 to show Individual-1's penis to him and he would tell Individual-1 if Individual-1 would make it as a pornstar. Individual-1 jokingly replied that his penis would not fit on the screen.

***ii. WhatsApp***

21. Between April 13 and 19, 2019, CEDEÑO and Individual-1 used WhatsApp to discuss additional sexual matters.

22. Namely, on or about April 13, 2019, CEDEÑO asked Individual-1 if the video was Individual-1's video and told Individual-1 that he was huge. This message presumably referenced a pornographic video previously shared between CEDEÑO and Individual-1

and referred to the size of a man's penis. Individual-1 responded by saying that he wished it was that huge. Minutes later, CEDEÑO messaged Individual-1 that he wanted to see one (a video) of a person performing oral sex on Individual-1. Individual-1 jokingly responded that those were VIP videos. CEDEÑO replied by sending a sad face emoji to Individual-1.

23. Days later, on or about April 15, 2019, CEDEÑO asked Individual-1 how much it would cost to see those VIP videos.

24. Later, on or about April 15, 2019, CEDEÑO messaged Individual-1 that he respected Individual-1's wife but thought that Individual-1 could send him a video showing Individual-1 masturbating. The message had money signs included with it. CEDEÑO told Individual-1 that he would erase the video after receiving it and would compensate Individual-1 for it. Later, CEDEÑO asked whether Individual-1 had worked up the courage to do it (send a video of Individual-1 masturbating). CEDEÑO asked Individual-1 to make sure that it stayed just between the two of them.

25. Later, on or about April 15, 2019, CEDEÑO apologized to Individual-1 and acknowledged that he was bothering Individual-1. Individual-1 replied that it was not that but rather Individual-1 had never done anything like that before (sending a video of Individual-1 masturbating to another man). CEDEÑO replied by telling Individual-1 that he had never asked anyone before (for such a video), accompanied with a smiley face emoji. CEDEÑO subsequently asked Individual-1 to send just a little one (presumably referencing a video of Individual-1 masturbating) and informed Individual-1 that he would erase it (presumably after viewing it). CEDEÑO continued to represent that he would make it up to Individual-1 and messaged Individual-1 money signs.

26. Later, on or about April 15, 2019, Individual-1 asked CEDEÑO how much money CEDEÑO would offer for the video because CEDEÑO was the boss. Individual-1 included language referencing a laugh and said that he was just kidding. Minutes later, CEDEÑO responded by asking Individual-1 how much money it would take for him to send the video but pleaded to make sure that it stayed between the two of them. In response to Individual-1 asking CEDEÑO to name a price, CEDEÑO told Individual-1 that he was

serious and did not want to offend Individual-1 if Individual-1 did not think the money he was offering was enough. CEDEÑO again asked to keep this (the request) between the two of them. Individual-1 said that he would.

27. Later, on or about April 15, 2019, CEDEÑO sent a series of messages over a span of several hours to Individual-1, in which he asked how much money Individual-1 would want for Individual-1 to send a couple of photos to him. CEDEÑO presumably was referring to photos of Individual-1's penis. CEDEÑO continued with the same line of questioning and offered Individual-1 forty dollars ($40) for what he had already requested. After receiving no response from Individual-1, CEDEÑO apologized to Individual-1.

28. Days later, on or about April 18, 2019, CEDEÑO apologized to Individual-1 again for having requested sexually explicit photos and videos. CEDEÑO assured Individual-1 that he would not talk to Individual-1 anymore so Individual-1 would feel comfortable. Individual-1 responded by telling CEDEÑO that it was not that and Individual-1 owed him a huge favor and respected him very much.[3] CEDEÑO responded by telling Individual-1 that Individual-1 was a good employee and he did not want Individual-1 to feel uncomfortable with his request.

29. Later, on or about April 18, 2019, CEDEÑO messaged Individual-1 that he thought they had reached a possible agreement, but claimed it had nothing to do with work. CEDEÑO conveyed that if Individual-1 was offended by the amount of money CEDEÑO was offering Individual-1 (for the video), Individual-1 could name a price. CEDEÑO added that he wanted Individual-1 to work without feeling uncomfortable and not to worry. Individual-1 responded by thanking CEDEÑO for understanding his position of not sending CEDEÑO any of the things that CEDEÑO had asked for. Minutes later, CEDEÑO apologized, told Individual-1 not to worry, and said he would not ask Individual-1 again (for sexually explicit photos and videos).

[3] As detailed later in the affidavit, Individual-1 felt loyal to CEDEÑO because CEDEÑO had helped him get his job with the County of Imperial in the first place. Individual-1 felt that CEDEÑO was taking advantage of Individual-1's sense of loyalty and gratitude with his requests for sexually explicit photos and videos.

**(2) Cell phone videos**

30. The Paladin investigator was also provided access to videos that ICHR found on CEDEÑO'S county-issued work phone. The phone contained three separate recordings which depicted CEDEÑO performing fellatio (oral sex) on another adult male employee at his place of employment ("Individual-2").

31. Individual-2 began his employment with the County of Imperial in 2014 as a maintenance technician and worked his way up to a supervisor for the public works department. CEDEÑO was Individual-2's direct supervisor.

32. The first video was dated June 13, 2019, and it was approximately nine minutes in length. The video began by showing CEDEÑO, in what appeared to be his office, setting up a device to record the encounter. It appeared as if CEDEÑO was trying to conceal the recording device's location.[4] Within a few minutes, Individual-2 entered CEDEÑO's office and CEDEÑO gave Individual-2 his phone. Individual-2 held the cell phone with his hand while CEDEÑO performed fellatio on him. Individual-2 held the phone in a manner that suggested he was watching something or recording the encounter. After a few minutes, Individual-2 began to masturbate while CEDEÑO licked his testicles. Shortly after that, it appeared that Individual-2 was ready to ejaculate and CEDEÑO once again began to perform fellatio on him until it appeared that he ejaculated into CEDEÑO'S mouth. Individual-2 then pulled up his pants and left the office, and CEDEÑO retrieved the recording device and shut it off.[5]

33. The second video was dated September 27, 2019, and it was approximately six minutes in length. The video began by showing CEDEÑO in a similar position as the first video referenced above, and the recording device once again appeared to be in a concealed location. Similar to the first video, after Individual-2 entered the office,

---

[4] Specifically, CEDEÑO looked around several times as if he was expecting someone to show up and did not want that person to see the recording device.

[5] According to the author of the Paladin investigation report, Individual-2 did not appear to be in shock or distraught on the video. Individual-2 appeared to have shown up in CEDEÑO'S office to engage in the sexual activity.

CEDEÑO gave Individual-2 his phone and Individual-2 held the cell phone in his hand while CEDEÑO performed fellatio on him. After several minutes of CEDEÑO performing fellatio on Individual-2, it appeared Individual-2 ejaculated in CEDEÑO'S mouth. After finishing, Individual-2 pulled up his pants and left the office.

34. The third video was undated, and it was approximately 34 seconds in length. The video showed CEDEÑO performing fellatio on a man whose face could not been seen. The clothing and body type of the unidentified man was similar to Individual-2, but the video was recorded from a different angle than the two videos above and it ended abruptly.

**(3) Email sent by CEDEÑO**

35. The Paladin investigator was also provided access to an email sent by CEDEÑO on or about February 10, 2024, to John Gay, the Director of Public Works for Imperial County, pertaining to an administrative investigation into CEDEÑO'S conduct. CEDEÑO sent the email from his Gmail account (eduardoc393@gmail.com).

36. In the email, CEDEÑO claimed that Individual-1 offered him sexual favors in exchange for promoting Individual-1 to a Facilities and Parks supervisor position. CEDEÑO said that he declined Individual-1's offer. CEDEÑO claimed that he never had any physical conduct with Individual-1 or any other county employee, but admitted to using his position to engage in sexual activity with Individual-2 and recording such sexual activity without Individual-2's knowledge. Specifically, CEDEÑO stated the following about Individual-2 in the email:

> It was completely wrong of me to have taken advantage of my position to make him do things he clearly did not want to do. This happened a few years ago, and I told him he had to [do them] if he wanted to keep his job. He was not aware that I had recorded him, after the two or three times he threatened to quit as he could not do this and was in a deep depression. Another thing not seen is him throwing up afterwards. My dumbass finally woke up and I stopped. So regardless of where th[is investigation goes], I want to be crystal clear that [Individual-2] is the victim of my poor judgment. I know feeling terrible for my actions doesn't make up for the fact that I have inflicted so much pain on him he did not and does not deserve. He did it because he didn't want to lose his job.

CEDEÑO claimed in this email that all the videos on his phone were old and he thought those items had been erased. CEDEÑO added, “I did not know that [the videos] were in my iCloud and downloaded when it synced when I would return home.”

**(4) Witness statements**

37. On or about February 28, 2024, the Paladin investigator interviewed Individual-1 and learned the following:

a. After starting employment at the County of Imperial, CEDEÑO began sending pornographic videos to Individual-1. Individual-1 thought it was unusual but had been told by other employees not to get on CEDEÑO’S bad side or Individual-1 would not pass his probationary period. As a result, Individual-1 did not confront CEDEÑO about the pornographic videos. Individual-1 said that he knew the names of two former employees who had been subjected to the same type of behavior by CEDEÑO and were no longer employed by Imperial County. Individual-1 also mentioned that there was a third employee who was scared to talk about the same type of behavior he had to endure from CEDEÑO. Individiual-1 was afraid that if he upset CEDEÑO, he would end up losing his job as he had been told by other employees.

b. In regard to the Facebook messenger and WhatsApp communications between CEDEÑO and Individual-1, Individual-1 shared that the exchange between them was always awkward. Individual-1 would try to keep the conversation light, inject humor into it, and steer it away to non-sexual subjects. Individual-1 said that he sent pornographic videos to CEDEÑO to go with the flow (i.e., be flexible and accept a situation as it happens) and claimed he would normally share such videos with some of his other groups of friends. When the messages began to become personal, such as CEDEÑO’S request for a video of someone performing fellatio on Individual-1, Individual-1 said that he did not reply immediately because Individual-1 did not know how to reply and did not want to upset CEDEÑO and have Individual-1 on his bad side. Individual-1 also spoke about the loyalty he felt for CEDEÑO because CEDEÑO had helped him get his job with the County of Imperial in the first place. Individual-1 felt that CEDEÑO was taking advantage of

Individual-1's sense of loyalty and gratitude. A few months after the messages began, Individual-1 began to ignore CEDEÑO'S messages and CEDEÑO apologized for having put him in that position. Following the messages, Individual-1 said that he tried to avoid CEDEÑO at work and CEDEÑO acted as if nothing ever happened between them.

c. A few months before Individual-1's interview with the Paladin investigator in February 2024, Individual-1 reported that CEDEÑO had approached Individual-1 at work while Individual-1 was sitting down and rubbed his penis against Individual-1's shoulder. Individual-1 told CEDEÑO to take it easy. CEDEÑO apparently looked at Individual-1, smiled, and left.

d. Further, approximately one week before the County of Imperial placed CEDEÑO on administrative leave in 2024, Individual-1 reported that CEDEÑO again approached him at work and fondled his groin area. A co-worker witnessed the incident and asked Individual-1 what was going on because he had seen what CEDEÑO had done. Individual-1 said that he shared his prior experiences with CEDEÑO with his co-worker. Individual-1 did not report this encounter because he was aware of other employees complaining about CEDEÑO'S behavior and was under the impression that nothing would happen to CEDEÑO if he reported it.

38. On or about March 4, 2024, the Paladin investigator interviewed Individual-2 and learned the following:

a. After a period of time working with CEDEÑO, CEDEÑO began to compliment Individual-2 on his looks and made comments about his appearance. Individual-2 felt uncomfortable about the comments at first but eventually got used to it and chalked it up to CEDEÑO just being that way.

b. Individual-2 said that he was aware of a complaint made by another employee against CEDEÑO for sending some type of pornographic video but claimed that he had not heard of any other complaints. Individual-2 stated that he would often see CEDEÑO being very touchy feely with other employees and reportedly told CEDEÑO that as the Deputy Director CEDEÑO should not be that way with other employees.

c. Individual-2 disclosed an incident where CEDEÑO had called him to his office and sexually propositioned him. Individual-2 appeared hesitant to report the conduct to the Paladin investigator but stated that it happened years ago and he did not want to carry it with him any longer. Individual-2 reported that conduct happened on two or three different occasions, about three to five years before the interview.

d. Individual-2 recalled that on the first occasion CEDEÑO called him into his office and sexually propositioned him by asking to see his penis and touching him over his pants. Individual-2 was shocked and froze up. CEDEÑO unzipped Individual-2's pants, touched his penis, and began to perform fellatio on him. Individual-2 then asked CEDEÑO to stop, which he did. The entire incident lasted no more than thirty seconds. Approximately three months later, CEDEÑO again called Individual-2 to his office and began to perform fellatio on him. This happened a third time before Individual-2 said it could not happen again. Individual-2 claimed that each of the incidents did not last more than a minute; he did not ejaculate in any of them; and he used CEDEÑO'S private office bathroom to put his clothes back and compose himself before leaving.

e. Individual-2 stated that after the incidents, he experienced tremendous emotional suffering and became depressed. Individual-2 felt that he did not have any recourse because CEDEÑO was his boss. Individual-2 wanted to report the incidents and speak to someone but did not believe anyone would believe him, as CEDEÑO apparently had deep connections with everyone at the County of Imperial.

f. Individual-2 said that he spoke with CEDEÑO after the incidents and told CEDEÑO it could not go on further. Individual-2 also told CEDEÑO that he had looked for another job so he could leave his employment at the County of Imperial. CEDEÑO apologized for his actions and Individual-2 ultimately decided to stay employed with the County of Imperial.

**(5) Training**

39. Lastly, the Paladin investigator also obtained a series of certificates showing that CEDEÑO had completed trainings on preventing sexual harassment in the workplace.

40. Specifically, CEDEÑO received a certificate of attendance and completion from the County of Imperial dated June 8, 2011, for "Sexual Harassment/Discrimination Prevention County of Imperial AB 1825 Training." CEDEÑO also received a certificate of attendance from the County of Imperial dated December 15, 2011, for "Recognizing, Correcting and Preventing Sexual Harassment in the Workplace."

**PROBABLE CAUSE EXISTS TO SEARCH THE SUBJECT ACCOUNT**

41. Based upon my training and experience, as well as my review of documents and records in this investigation, there is probable cause to believe that evidence of the **Subject Offenses** will be found in the **Subject Account.** Specifically, CEDEÑO stated in an email dated February 10, 2024, that the videos he recorded on his phone – including the videos he recorded of his sexual activity at work – synced to his Apple iCloud account when he returned home. Accordingly, there is reason to believe that such videos will be found on the **Subject Account**, among other relevant documents, records, and information pertaining to the **Subject Offenses**. A preservation request for the **Subject Account** was sent to Apple on or about September 29, 2026.

**BACKGROUND CONCERNING APPLE**

42. In my training and experience, I have learned that Apple is a U.S. company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system. Apple also provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and iCloud.com.

b. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

c. iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via iCloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

f. Location Services allows apps and websites to use information from cellular, Wi-Fi, GPS networks, and Bluetooth, to determine a user's approximate location.

g. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

43. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @iCloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

44. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the IP address used to register and access the account, and other log files that reflect usage of the account.

45. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use

of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

46. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through iCloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

47. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on

iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

48. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

49. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the **Subject Offenses**. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the **Subject Offenses**.

50. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows Investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

51. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g.,

information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

52. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from the App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

53. Thus, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## GENUINE RISK OF DESTRUCTION OF EVIDENCE

54. Based upon my training and experience, and the training and experience of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, if CEDEÑO receives advanced warning of the execution of this warrant, there will be a genuine risk of destruction of evidence.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

55. Other than what has been described in this affidavit, to my knowledge the United States has not attempted to obtain the contents of the **Subject Account** by other means to date.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

56. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Apple are not. It would be inappropriate and impractical for federal agents and law enforcement officers and/or officials to search the vast computer network of Apple

for the relevant account and then to analyze the contents of the account on the premises of Apple. The impact on Apple's business would be disruptive and severe.

57. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the Apple account, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Apple, to protect the privacy of Internet Service Provider ("ISP") subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, law enforcement seeks authorization to allow Apple to make a digital copy of the entire contents of the account(s) subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

58. Analyzing the data to be provided by Apple may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database, and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISPs including Apple do not always organize the electronic files they provide chronologically, which makes review more time

consuming and may also require the examiner to review each page or record for responsive material.

59. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques, as well as a filter review for privileged information, and, thus, may take weeks or months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to assess if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to the court.

60. Based upon my training and experience, and the training and experience of other agents with whom I have communicated, it is necessary to review and seize all electronically stored data that identify any users of the **Subject Account** and any electronically stored mails sent or received in temporal proximity to the **Subject Offenses** and the specified time period of the authorized search.

61. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## REQUEST FOR SEALING AND PRECLUSION OF NOTICE

62. I respectfully request that this Court issue an order sealing this affidavit and the application, warrant, motion to seal, order on the motion to seal, and related papers until further order of this Court.

63. Sealing is necessary as the application, affidavit, warrant, and related papers disclose an ongoing investigation whose nature and scope is not known by CEDEÑO and subjects of the investigation. There is reason to believe that premature disclosure of the existence of the search warrant documents and the investigation may result in destruction of evidence, flight from prosecution, change or alteration in patterns of behavior, or seriously jeopardize an ongoing investigation. Accordingly, I request that the warrant and its related materials, including this affidavit, be sealed until further order of this court.

64. Further, under 18 U.S.C. § 2705(b), I respectfully request that this Court order the electronic service provider to whom this warrant is directed not to notify anyone of the existence of the warrant, other than its personnel essential to compliance with the execution of this warrant, until 180 days, or May 5, 2027, absent further order of this Court.

**CONCLUSION**

65. Based on the facts and information above, there is probable cause to believe that a search of the **Subject Account** will yield evidence of the **Subject Offenses**. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A and to seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

________________________________
FBI Special Agent Brittany Radke

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this ___ of November, 2026.

________________________________
Honorable Brian J. White
United States Magistrate Judge
Southern District of California

# ATTACHMENT A

## Property to be Searched

Apple, Inc. is an electronic communications service provider and/or remote computing service provider with its primary computer information systems and storage systems, records, and data located at One Apple Park Way, Cupertino, California 95014.

# ATTACHMENT B

## Items to be Seized

## I. Service of Warrant

The officer(s) executing the warrant shall permit Apple Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer(s).

## II. Information to be Disclosed by Apple Inc.

All subscriber and/or user information and content, all electronic mail, messaging, images, videos, text messages, histories, phone and VoIP logs, contacts or friend lists, profiles, method of payment, detailed billing records, access logs, backup data, transactional data, and any other files or records associated with the following Apple ID, iCloud account number, and/or user (the "**Subject Account**"):

| Account | User |
|---|---|
| Apple ID: eduardoc393@gmail.com<br>DS ID: 1038070157 | Eddie CEDEÑO |

Apple is hereby ordered to disclose the above information to the United States within 14 days of service of this warrant to the following:

Special Agent Brittany Radke
Federal Bureau of Investigation
San Diego Field Office, Imperial County Resident Agency
516 Industry Way, Ste. D, Imperial, CA 92251
BRADKE@fbi.gov

## III. Information to be Seized by the United States

The search of the data supplied by Apple, Inc. pursuant to this warrant will be conducted as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of the warrant. The search will be limited to all information described above in Section II that constitutes evidence of violations of 18 U.S.C. §§ 1346 (Honest Services Fraud), 2242 (Sexual Abuse by Threat, Fear, or

Coercion), 2244 (Abusive Sexual Contact), 1801 (Video Voyeurism), and 875 (Extortion by Interstate Communication) (collectively, the "**Subject Offenses**") between the period of January 1, 2019 to the present and to the seizure of:

a. Communications, records, and attachments tending to discuss or establish involvement in or knowledge of the **Subject Offenses**;

b. Communications, records, and attachments tending to identify co-conspirators, criminal associates, victims, potential victims, or others involved in the **Subject Offenses**;

c. Information that constitutes evidence of the identification or location of the user(s) of the account(s) and any co-conspirators involved in the activities described in III(a)-(b);

d. Communications, records, and attachments relating to:

   i. Individual-1, Individual-2, and/or John Gay;

   ii. CEDEÑO propositioning individuals employed at the County of Imperial to engage in sexual conduct and/or contact at work;

   iii. Efforts by CEDEÑO to cause individuals employed at the County of Imperial to engage in sexual conduct and/or contact by threatening or placing them in fear of losing their job;

   iv. Efforts by CEDEÑO to cause individuals employed at the County of Imperial to engage in sexual conduct and/or contact through coercion.

   v. CEDEÑO engaging in sexual conduct and/or contact at premises owned, controlled, or maintained by County of Imperial;

   vi. CEDEÑO surreptitiously recording sexual conduct and/or contact with other individuals, including at premises owned, controlled, or maintained by the County of Imperial;

   vii. CEDEÑO capturing images of a private area of an individual without the individual's consent, including at premises owned, controlled, or maintained by the County of Imperial; and

   viii. Sharing, distributing, or selling images, videos, or recordings of individuals employed at the County of Imperial engaging in sexual conduct and/or contact;

e. Communications, records, and attachments that provide context to any communications or matters described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the **Subject Account**, including:

i. Evidence indicating the account owner's intent to commit a crime (e.g., information indicating a plan to commit a crime) and consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement) as it relates to the **Subject Offenses**;

ii. Evidence indicating how and when the account was accessed or used, to determine context (e.g., chronological, geographic, etc.) of account access, use, and events relating to the **Subject Offenses** and to the account owner/user; and

iii. The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s).

f. All records or other information regarding the identification of the **Subject Account**, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

g. All records or other information regarding the devices associated with, or used in connection with, the **Subject Account** (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

h. All activity, connection, and transactional logs for the **Subject Account** (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and capability query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

i. All records and information regarding locations where the **Subject Account** or devices associated with the **Subject Account** were accessed, including all data stored in connection with Location Services, Find My, and Apple Maps;

j. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).